UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD LEE,

              Petitioner,                           Hon. Wendell A. Miles

v.                                              Case No. 5:02-CV-83

KURT JONES,

              Respondent.

_____/


## <u>REPORT AND RECOMMENDATION</u>

        This matter is before the Court on Lee's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Lee's petition be **denied**.


## <u>BACKGROUND</u>

        As detailed below, Manson Grant (a.k.a. Slim or Papa) was robbed and assaulted on or about July 24, 1997. As a result of his alleged involvement in this crime, Petitioner was charged with one count of armed robbery and following a preliminary examination, he was bound over for trial on this charge. (Dkt. #29-31).

        Grant died on or about August 28, 1997, and the State subsequently charged Petitioner with felony murder. (Dkt. #32). Following a preliminary examination, however, the district court determined that there did not exist sufficient evidence to charge Petitioner with felony murder. (Dkt.

#42).  Accordingly, the court ordered that the felony murder charge be dismissed and that the matter proceed to trial on the charge of armed robbery.  The prosecution appealed this determination to the Muskegon County Circuit Court which upheld the district court's determination.  The prosecution thereafter sought relief in the Michigan Court of Appeals, without success.  Petitioner was, therefore, tried before a jury on one count of armed robbery.  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

**Donetta Bolden**

Bolden was Grant's daughter-in-law.  (Trial Transcript, April 15, 1998, 213-15).  As of July 1997, Grant was a single retiree who lived alone.  *Id.* at 214-16.  Bolden visited Grant daily to prepare his meals.  *Id.* at 213-15.  Bolden also helped Grant pay his bills and maintain his finances.  *Id.* at 215, 219.  According to Bolden, "everybody" who knew Grant was aware that he routinely carried "thousands" of dollars on his person.  *Id.* at 219-24.  Bolden often warned Grant to "stop pullin' all that money out."  *Id.* at 224.  Bolden was concerned that Grant would get robbed.  *Id.* at 312.  A "few days" prior to July 24, 1997, Bolden cashed several checks for Grant totaling more than $3,500.  *Id.* at 221-24.  After cashing these checks, Bolden gave the money to Grant who placed it in his wallet.  *Id.* at 222-23.

Grant owned several rental properties and employed Petitioner to perform yard work and various other tasks.  *Id.* at 226-28.  Grant referred to Petitioner as "his yard boy."  *Id.* at 227.  Approximately "a week to a week and a half" prior to July 24, 1997, Petitioner and Grant had a dispute regarding money which Petitioner felt Grant owed him.  *Id.* at 227-31.  Petitioner told Grant that "you owe me; you didn't pay me," to which Grant responded "man, I done paid you.  I don't owe you no money."  *Id.* at 233-34.  Petitioner then raised his voice and told Grant, "I'm gonna get my money from

you one way or the other." *Id.* After realizing that Bolden had witnessed this encounter, Petitioner added "even if I have to take you to court, I'm gonna get my money." *Id.* at 233.

On the evening of July 24, 1997, Bolden visited Grant. *Id.* at 235. Grant gave Bolden some money to pay some of his bills, but after doing so Grant still "had over a thousand dollars on him." *Id.* at 235, 309. Bolden left Grant's residence between 8:00 p.m. and 8:30 p.m. that evening. *Id.* at 235-36. Bolden returned the following afternoon at approximately 1:00 p.m. *Id.* at 236-37. Bolden rang the doorbell, but Grant did not answer. *Id.* at 237. Bolden then "beat on the door" with no response. *Id.* Bolden observed that Grant's vehicles were present. *Id.* at 237-38. Bolden then went home and telephoned Grant's residence, but nobody answered her call. *Id.* at 238. Bolden was concerned because Grant normally informed her if he was leaving his house to go somewhere. Bolden returned to Grant's house and again began ringing the doorbell and banging on the door. *Id.* Bolden then began yelling for Grant through the mail slot on his front door. *Id.* at 238-41. At this point, Bolden heard Grant respond "come in" in a "real weak" voice. *Id.* at 241. With the assistance of another person, Bolden forced open the door to Grant's residence. *Id.* at 240-44.

Bolden found Grant laying on the floor between the bedroom and the dining room "all beat up." *Id.* at 244. Grant's mouth was "full of blood" and his face "was just messed up." Bolden also noticed that Grant's "pockets was inside out." *Id.* Bolden was unable to telephone the police because the telephone cord had been cut. *Id.* at 245. Bolden attempted to use a different telephone, but realized that the cord to that telephone had also been cut. After instructing a neighbor to telephone the police, Bolden asked Grant "who did this to you?" *Id.* Grant responded, "the yard boy." *Id.* at 245-46. Grant told Bolden that "the boy took his money and beat him up" with "a pipe." *Id.* at 246-47. Rescue personnel arrived soon thereafter and began treating. *Id.* at 249-50. Despite his injuries, Grant

recognized with whom he was speaking and his statements and responses (to Bolden and rescue personnel) were normal and consistent with the events. *Id.* at 246-50.

Bolden observed Grant's wallet laying two to three feet away from Grant's body. *Id.* at 248-49. The wallet was empty. *Id.* at 249. Bolden also observed that it appeared that somebody had been rummaging through the drawers of Grant's dresser. *Id.* at 258. Bolden accompanied Grant to the hospital and heard Grant tell his care providers that "the yard boy did it." *Id.* at 259-60.

On July 28, 1997, Detective Clifton Johnson arrived at the hospital to speak with Grant. (Trial Transcript, April 15, 1998, 260-61; Trial Transcript, April 17, 1998, 658). Bolden testified that she was present during this encounter and that Grant recognized the detective and provided cogent and appropriate responses to his questions. (Trial Transcript, April 15, 1998, 261). A couple days later, however, Grant began to intermittently experience confusion and cognitive difficulty. *Id.* at 265-69. Bolden testified that these difficulties were not present until after the attack and robbery. *Id.* at 268. Bolden further testified that despite his cognitive difficulties, Grant never wavered from his assertion that "the yard boy did it." *Id.* at 269.

**Officer Gary Cheatum**

As of July 25, 1997, Cheatum was employed as a police officer by the Muskegon Heights Police Department. (Trial Transcript, April 16, 1998, 598). On the afternoon of July 25, 1997, Officer Cheatum was dispatched to Manson Grant's residence. *Id.* at 599. By the time Cheatum arrived, an ambulance and fire truck were already on the scene. Cheatum observed that Grant was "laying on the ground" with "a gash in his forehead." *Id.* Grant's pants pockets were "turned out" and a nearby table was overturned. *Id.* at 600. Cheatum also noticed that the cord to the living room telephone had been

cut. *Id.* at 600-01. Officer Cheatum spoke with Grant. *Id.* at 602. Grant was aware of who he was and where he was. *Id.* at 603. Grant recognized that Cheatum was a police officer and his responses to Cheatum's questions were logical and responsive. *Id.* at 602.

**Allean Ruth Roberts**

She was Grant's daughter. (Trial Transcript, April 15, 1998, 388-89). In the months prior to the robbery, she spoke with Grant on the telephone once a week. *Id.* at 389. During these conversations, Grant asked appropriate questions and responded to Roberts' questions in an appropriate manner. *Id.* at 389-90. Grant always knew who Roberts was and did not exhibit any signs of delusions or other thought disorder. *Id.* Roberts testified that she was always concerned because her father "always carried large amounts of money on his person. . .and people in the neighborhood knew that." *Id.* at 393-94.

Roberts visited her father in the hospital on July 27, 1997. *Id.* at 394-95. Grant knew who he was and that he was in the hospital. *Id.* at 396-97. He recognized his daughter and knew what had happened to him. *Id.* Grant was able to engage in rational conversation. *Id.* at 396. Roberts continued to visit her father in the hospital approximately twice weekly. *Id.* at 397. Roberts testified that her father always recognized her and knew why he was in the hospital and never exhibited any signs of agitation, disturbance of mood, anger, or paranoia. *Id.* at 398-99. During these many conversations, Grant never indicated that he was attacked by anybody other than "the yard boy." *Id.* at 397.

**Renee Williams**

Williams lived across the street from Grant, whom she referred to as Papa, and had known him for eleven years.  (Trial Transcript, April 16, 1998, 420).  Williams regularly spoke with Grant.  *Id.* at 422-23.  Williams last spoke with Grant on July 4, 1997.  *Id.* at 423.  During this conversation, Grant recognized Williams and her son.  *Id.*  Grant knew where he was and engaged in appropriate conversation with Williams and her son.  *Id.* at 423-24.  On one of her visits to Grant's residence, Williams met Petitioner, who Grant referred to as the "yard boy." *Id.* at 446.

On the afternoon of July 25, 1997, Williams observed Donetta Bolden enter Grant's residence. *Id.* at 426-29.  Bolden immediately exited the house and instructed Williams to telephone the police.  *Id.* at 428-29.  After doing so, Williams proceeded to Grant's residence.  *Id.* at 429.  Upon entering the residence Williams observed that Grant "was layin' on the floor with blood, and the telephone cord was cut." *Id.* at 430.  Williams walked "close to" Grant, at which point Grant stated, "look what the - - the yard boy did to Papa." *Id.* at 430-31.  At this point, Williams began screaming and ran out of the house.  *Id.* at 431.

**Marc Roberts**

Roberts was Manson Grant's grandson.  (Trial Transcript, April 16, 1998, 457).  During 1997, Roberts visited his grandfather "twice a week at least." *Id.*  During these visits, Roberts and Grant would "talk and go different places, go shopping, to restaurants." *Id.* at 458.  Grant always recognized his grandson and "always seemed to know what was going on." *Id.* at 458-59.  Roberts visited his grandfather in the hospital approximately one week after the robbery and assault. *Id.* at 460-62.  Grant

recognized Roberts and knew what had happened to him and where he was. *Id.* at 462-64. The content of Grant's speech was related to their topics of conversation. *Id.* at 464.

**Joseph Miller**

Miller served as a deacon in the church that Grant attended. (Trial Transcript, April 16, 1998, 471). Miller attended church "most Sundays" and would speak with Grant on such occasions. *Id.* at 472. Grant would also visit Miller at his home "every so often." *Id.* at 473. With respect to his conversations with Grant in 1997, Miller indicated that Grant "understood what he was saying." *Id.* at 473-74. Miller testified that every Tuesday, Grant drove himself to the farmer's market and "was very capable and able to go out on his own." *Id.* at 474. Miller visited Grant "about" three days before he was robbed and assaulted. *Id.* During this visit, Grant recognized Miller and knew where he was. *Id.* at 475-76. Grant's participation in their conversation was rational and related to Miller's comments and the topic of conversation. *Id.* at 476. Miller visited Grant in the hospital a "couple days" after the attack. *Id.* at 477. Grant recognized Miller, understood where he was, and understood why he was in the hospital. *Id.* at 477-81. Miller testified that Grant's participation in their conversation "made very much sense." *Id.* at 481-82.

**Dr. Wayne Kohn**

Manson Grant was a patient at Dr. Kohn's clinic. (Trial Transcript, April 16, 1998, 496). The doctor testified that he examined Grant "on occasions" between 1996 and early 1997. During these examinations Grant was "alert" and exhibited "no apparent interference with his cognitive functions, his mental capacity or his thinking." *Id.*

**L.D. Grieve**

Grieve was employed by G&G Pawn and Outlet. (Trial Transcript, April 16, 1998, 408). Grieve testified that G&G engaged in "buy/sell agreements. . .between the general public and the store." Pursuant to these agreements, G&G purchased an item from the customer. *Id.* The customer was then given "a certain period of time to come back and buy it back at a markup." *Id.* at 408-09. If the customer failed to timely return and purchase the item in question, it became the property of G&G which could then sell the item to the general public. *Id.* at 409-10.

On July 10, 1997, Petitioner sold to G&G a guitar, valued at approximately $800-$1000, for $200. *Id.* at 414-15. Petitioner was given until July 24, 1997, to repurchase the guitar or surrender the item to G&G. *Id.* at 417. Grieve testified, however, that it was "common practice" for him to give customers an extra day or two to repurchase items. *Id.* at 417-18. Grieve further testified that he had engaged in previous buy/sell transactions with Petitioner. *Id.* at 418. On July 19, 1997, Petitioner sold a vacuum to G&G for $15. *Id.* at 412-13. On July 25, 1997, Petitioner returned to G&G and repurchased the vacuum for $21.20 and repurchased the guitar for $275.60. *Id.* at 413-15. Petitioner paid for these items with cash. *Id.*

**Detective Clifton Johnson**

On July 27, 1997, Johnson was assigned to assist in the investigation of the Grant robbery and assault. (Trial Transcript, April 17, 1998, 658). Johnson lived near Grant and encountered him from "time to time." *Id.* at 658-60. On July 28, 1997, Detective Johnson visited Grant in the hospital. *Id.* Grant recognized Johnson. *Id.* at 659. Grant was aware that he was in a hospital and understood why he was there. Johnson spoke with Grant about the crime and Grant's responses "ma[d]e sense." *Id.*

When asked what had happened to him, Grant stated that "his yard boy had come over asking for $25." *Id.* at 660.  Detective Johnson asked Grant whether he could identify "his yard boy," to which Grant stated, "yeah."  Detective Johnson did not at that point show any photographs to Grant, but instead continued his conversation with Grant about the matter.  Grant informed Johnson that "he refused to give his yard boy $25 because he didn't owe him anything else." *Id.*  When asked whether he had been carrying any money at the time of the attack, Grant "didn't say the specific amount but he did say he had money in his shirt pockets and in his pant pockets." *Id.* at 660-61.  Grant reported that the two continued to argue about the matter and "next thing he did was get hit in the head with a metal pipe." *Id.* at 660.  When Grant awoke he tried to use the telephone, but "the phone lines were cut." Grant then realized that "his pockets were empty" and that "he was just hoping someone would find him." *Id.*

Johnson then showed Grant a "set" of photographs. *Id.* at 661.  This set contained six pictures of black males "all somewhat similar in appearance." *Id.*  After receiving the photographs, Grant went through them "one by one" and identified Petitioner's photograph. *Id.* at 662.  Grant then stated to Johnson that "he didn't have to beat my ass the way he did." *Id.*


**Detective-Sergeant Mel Jordan**

As of October 28, 1997, Jordan was employed as a detective-sergeant for the Muskegon Heights Police Department.  (Trial Transcript, April 17, 1998, 646).  Jordan testified regarding an interview of Petitioner (conducted by another police officer) which he viewed. *Id.*

Petitioner indicated that he had known Manson Grant for three years and had been employed by him to perform "lawn maintenance."  (Tr. 646-47).  Petitioner reported that Grant had

refused to pay him $25 that he owed him. (Tr. 647). Petitioner stated that he was "upset" at this and "threatened to take Mr. Grant to court." *Id.* Petitioner acknowledged that he knew that Grant "always carried large sums of money." *Id.* at 647-48. When asked why he was being prosecuted in this matter, Petitioner stated that it was because Donetta Bolden "was upset at him because he didn't have an affair with her." *Id.* at 648. When Petitioner was informed that Grant had picked him out of a photographic line-up, Petitioner responded that "there was no way that Mr. Grant could have picked him out of a photo lineup due to his mental capacity." *Id.* at 649. Petitioner denied robbing Grant or hitting him with a pipe. *Id.* at 649-50.

**John Jamerson, Jr.**

In December 1997, Jamerson shared a cell with Petitioner in the Muskegon County Jail. (Trial Transcript, April 16, 1998, 542-43). Petitioner eventually began discussing with Jamerson the events that resulted in his arrest and incarceration. *Id.* at 543-44. Petitioner told Jamerson that he had performed some yard work for Grant. *Id.* at 546. Petitioner then indicated that "Grant had paid him, but still had shorted him." According to Petitioner, Grant shorted him by $25. *Id.* Petitioner told Jamerson that he argued with Grant about the matter and that Grant eventually paid him the $25, but also informed Petitioner that he would no longer employ him. *Id.* at 546-47. This "upset" Petitioner. *Id.* at 576. According to Petitioner, he then had a "verbal altercation" with Grant after which he struck him with a pipe. *Id.* at 548, 576. According to Jamerson, Petitioner did not indicate whether he then stole any additional money from Grant. *Id.* at 576-77. Petitioner then told Jamerson that his defense at trial was going to be that Grant was confused and did not possess a good memory. *Id.* at 577-78.

**Dr. Anthony Wilson**

Dr. Wilson testified as an expert in the area of physical medicine rehabilitation. (Trial Transcript, April 17, 1998, 704-10). Dr. Wilson examined Manson Grant on July 29, 1997, to determine whether he was a candidate to participate in rehabilitation. *Id.* at 710. Grant was alert to person and place, but mistakenly "thought the year was 1970 and the President of the United States was Lyndon Johnson." *Id.* at 712. The doctor concluded that Grant was suffering from "a concussion syndrome." *Id.* at 713. Grant was admitted to the rehabilitation unit the following day where he received treatment until his discharge on August 13, 1997. *Id.* at 713-14. According to Dr. Wilson, Grant's "orientation to person, place and time fluctuated while in the rehab unit." *Id.* at 715. Accordingly, Grant was referred to a neurologist who diagnosed Grant with "senile dementia of the Alzheimer's type." *Id.* Dr. Wilson acknowledged, however, that he was neither a neurologist nor an expert concerning Alzheimer's disease. *Id.* at 706, 717. The doctor also acknowledged that he could offer no opinion regarding Grant's cognitive abilities prior to July 29, 1997. *Id.* at 718.

**Mark Mahacek**

Mahacek was a licensed psychologist and a clinical neuropsychologist. (Trial Transcript, April 15, 1998, 348). Mahacek was permitted to testify as an expert in the field of neuropsychology. *Id.* at 351.

Mahacek examined Grant "five or six" times in August 1997 to "determine what his specific cognitive strengths and weaknesses were." *Id.* at 352-53. Mahacek testified that Grant "knew what happened to him." *Id.* at 367. Mahacek characterized Grant's motivation as "good" and his mood as "very good." *Id.* at 353-54. A CT scan of Grant's brain revealed that he had suffered a "small

subdural hematoma." *Id.* at 355-56. Mahacek reported that given this finding he tested Grant for

anosagnosia, a "memory difficulty that a lot of stroke patients or head-injury patients suffer from." *Id.*

at 354, 356. Mahacek testified that this disorder manifests itself in an inability to identify "specific

faces." *Id.* at 354. Grant did not suffer from anosagnosia. *Id.* at 354-55.

Mahacek did, however, diagnose Grant as suffering from "senile onset Alzheimer's

dementia." *Id.* at 357-58. Mahacek testified that there exist three separate phases in the progression of

this disease. *Id.* at 358. In the initial phase, the individual "typically has some mild memory deficits,

concentration and attention deficits, some problems with judgment." *Id.* Mahacek also noted that an

individual in this initial phase of Alzheimer's will experience "good days" and "bad days." *Id.* at 369.

Mahacek testified that based on his observations, Grant was experiencing the initial phase of

Alzheimer's and that "the progression of the disease was probably slow." *Id.* at 358-61.

Mahacek tested Grant for confabulation, "a defense mechanism that patients use when

they recognize the fact that they have severe memory problems." *Id.* at 361. Mahacek described that

he tested Grant for confabulation by reading a series of stories which Grant would then have to repeat

back. *Id.* If Grant were engaging in confabulation he would "make details up" that were not in the

stories to make it appear that he is "spewing out more information" and, therefore, has a better memory.

*Id.* at 361-62. Grant did not exhibit any signs of confabulation. *Id.* at 362.


**Dr. Stephen Cohle**

Dr. Cohle testified as an expert in forensic pathology. (Trial Transcript, April 17, 1998,

730-31). Dr. Cohle performed an autopsy on Manson Grant on September 1, 1997. *Id.* at 731-32. An

examination of Grant's brain revealed "extensive atrophy." *Id.* at 732-33. The doctor testified that such

atrophy "might. . .affect accuracy in terms of memory and recall." *Id.* at 733. Dr. Cohle also discovered

evidence that Grant had suffered "a blow to the head." *Id.* at 734. The doctor acknowledged, however,

that each person's brain atrophies (or shrinks) as they age and that, therefore, it was not inconsistent that

Grant's brain had atrophied considering that he was 81 years of age when he died. *Id.* at 735. Dr. Cohle

further acknowledged that while Grant's brain had atrophied, its size was within the normal range. *Id.* at

736.

      After considering the evidence, the jury found Petitioner guilty of armed robbery. (Trial

Transcript, April 21, 1998, 819). Petitioner was sentenced to serve 25 to 40 years in prison. (Sentencing

Transcript, May 18, 1998, 18). Petitioner appealed his conviction to the Michigan Court of Appeals

asserting the following claims:

> I.    Longstanding Michigan precedent requires that the prosecution produce direct or circumstantial evidence on each element of the crime. These elements include a showing that a larceny occurred at the time of the assault, and that Defendant was the person who committed the act. Defendant's conviction should be reversed where the prosecution failed to sustain its trial burden on these essential elements.

> II.   The trial court abused its discretion when it permitted the prosecutor to introduce evidence regarding Manson Grant's statements of identification made to Donetta Bolden, Renee Williams, and Detective Clifton Johnson, under the catchall hearsay provision MRE 803(24). The admission of these statements violated Defendant's rights under the confrontation clauses of the U.S. and Michigan Constitution.

> III.  Defendant was denied his right to counsel at a pre-custody photographic lineup, where the victim identified him as the assailant, he was the only suspect in the case and the clear intent of the lineup was to build a case against the Defendant.

IV.     The trial court's jury instructions were reversibly
        erroneous where it failed to give cautionary instructions
        on the identification of the Defendant which was
        Defendant's theory of the case, and was a basic and
        controlling issue.

        A.     Trial counsel was ineffective for failing to
               insure that the jury was properly
               instructed.

V.      The U.S. Supreme Court and Michigan Supreme Court
        have determined that sentencing is a critical stage of a
        criminal proceeding at which, a defendant is guaranteed
        the right of the effective assistance of counsel.
        Defendant's counsel refused to allocute on his behalf,
        despite being given opportunities to do so by the court.
        Defendant is entitled to resentencing.

VI.     Defendant's sentencing proceeding was tainted by
        reversible error where:

        A.     The trial court failed to properly consider
               all of the well established sentencing
               factors and standards for a valid sentence,
               and failed to individualize Defendant's
               sentence where it imposed a 25-40 year
               sentence upon him.

        B.     The trial court violated the concept of
               proportionality in imposing a 25-40 year
               sentence upon Defendant.

        The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Lee*, No.

219538, Opinion (Mich. Ct. App., Nov. 3, 2000). Petitioner moved in the Michigan Supreme Court for

leave to appeal the decision of the court of appeals. In this request for relief, Petitioner asserted the

claims identified immediately above, as well as the following additional claims:

        I.     Defendant was deprived of his right to the effective
               assistance of counsel, due process and equal protection of
               law under the Sixth and Fourteenth Amendments before,

-14-

during and after trial and on appeal of right where counsel made mistakes so serious that they were not functioning as lawyers with ordinary training and skill under an objective standard of reasonableness and prejudiced Defendant.

II.     Defendant was deprived of his right to a speedy trial, due process and equal protection of law under the Sixth and Fourteenth Amendments where the prosecution failed to show good faith and any effort to bring this matter to trial and the trial court abused its discretion when it denied Defendant's motion to dismiss and set an extremely high bond.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Lee*, No. 118293, Order (Mich., May 29, 2001).  On May 22, 2002, Petitioner submitted the present petition for writ of habeas corpus in which he asserts the following claims:

I.      Violation of Defendant's 14th Amendment right to due process, where the prosecution failed to present sufficient proof of every element of the crime charged.

II.     Violation of Defendant's 6th and 14th Amendment right to due process and confrontation and cross examination, where the court admitted the victim's out of court heresay statements under a new catchall hearsay rule.

III.    Violation of Defendant's 6th and 14th Amendment right to counsel and due process during the pre-custody photographic lineup.

IV.     Violation of Defendant's 6th and 14th Amendment right to effective assistance of counsel and due process where counsel failed to object to the improper jury instruction given by the court.

V.      Violation of Defendant's 6th and 14th Amendment right to effective assistance of counsel and due process, where trial counsel failed to allocute at sentencing.

-15-

VI.     Violation of Defendant's 14th Amendment right to due process, where the trial court failed to impose an individualized sentence and violated the concept of proportionality at the time of sentencing.

VII.    Violation of Defendant's 6th and 14th Amendment right to effective assistance of counsel and due process, throughout trial and appellate proceedings.

VIII.   Violation of Defendant's 6th and 14th Amendment right to a speedy trial, due process and equal protection of the law.

The Court subsequently determined, however, that Petitioner had failed to properly exhaust claims VII and VIII asserted in his petition for habeas relief. (Dkt. #6, 14). The Court subsequently stayed this matter so as to permit Petitioner to return to state court to properly exhaust all the claims asserted in his petition for writ of habeas corpus. (Dkt. #14).

Petitioner returned to the trial court and moved for post-conviction relief based on the issues asserted in claims VII and VIII of his petition for writ of habeas corpus. (Dkt. #44). With respect to Petitioner's claim that he was denied the right to the effective assistance of trial counsel and the right to a speedy trial, the court denied relief on the ground that Petitioner could have asserted those claims in his appeal as of right. *People v. Lee*, No. 97-141064-FC, Opinion (Muskegon Cnty. Cir. Ct., June 10, 2003). As for Petitioner's claim that he was denied the right to the effective assistance of appellate counsel, the court denied relief on the ground that such claim was without merit. *Id.* Petitioner subsequently moved in the Michigan Court of Appeals for leave to appeal this determination. The court denied Petitioner's request on the ground that he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Lee*, No. 252232, Order (Mich. Ct. App., Mar. 12, 2004). Petitioner then moved in the Michigan Supreme Court for leave to appeal the decision of the Michigan

Court of Appeals.  The court denied Petitioner's request on the ground that he "has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Lee*, No. 126065, Order (Mich., Oct. 25, 2004).  Petitioner has, therefore, properly exhausted all the claims asserted in his petition for writ of habeas corpus.

## STANDARD OF REVIEW

Lee's petition, filed May 22, 2002, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant

state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

   Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

   The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim.  As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts a *de novo* review.  *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.   **Sufficiency of the Evidence Claim**  (Habeas Claim I)

   Petitioner asserts that he is entitled to habeas relief because "the prosecution failed to present sufficient proof of every element of the crime charged."  Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the

prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).  Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law in effect as of the date Petitioner committed the acts for which he was convicted, the elements of armed robbery were: (1) an assault; (2) a felonious taking of property from the victim's person or presence; and (3) the defendant must be armed with a weapon described in the statute.  *People v. Johnson*, 547 N.W.2d 65, 71 (Mich. Ct. App. 1996).  Pursuant to the relevant statute, this last element was satisfied where the defendant was "armed with a dangerous weapon, or any article used or fashioned in a manner to lead the person so assaulted to reasonably believe it to be a dangerous weapon."  Mich. Comp. Laws § 750.529 (1997); *see also, People v. Harris*, 1997 WL 33487029 at *1 (Mich. Ct. App., July 18, 1997) ("a dangerous weapon within the meaning of the statute includes 'an article which is in fact a dangerous weapon - a gun,. . .etc. or some article harmless in itself, but used or fashioned in a manner to induce the reasonable belief that the article is a dangerous weapon'") (quoting *People v. Parker*, 339 N.W.2d 455 (Mich. 1983)).

Because armed robbery is a specific intent crime, the prosecution "must establish that the defendant intended to permanently deprive the owner of the property."  *People v. King*, 534 N.W.2d 534, 536 (Mich. Ct. App. 1995).  As Michigan courts recognized, "[c]ircumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime" and, furthermore, "[s]pecific intent may be inferred from circumstantial evidence."  *Harris*, 1997 WL 33487029 at *2.

Viewing the evidence detailed above in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of armed robbery.  With respect to this particular claim, the Michigan Court of Appeals concluded:

> From the aforementioned evidence, a jury could reasonably infer that the victim had cash on his person at the time defendant came to his house and that defendant deprived him of that cash, leaving him incapacitated and with an empty wallet and pockets.  Therefore, viewed in a light most favorable to the prosecution, the evidence was sufficient to indicate that defendant was assaulted, that defendant intended to and, in fact, took property from the victim, and that defendant was armed with a lead pipe.

*People v. Lee*, No. 219538, Opinion at 2 (Mich. Ct. App., Nov. 3, 2000).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


II.        **Confrontation Clause Claim**  (Claim II)

The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right. . .to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This provision is applicable to the states through the Fourteenth Amendment.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).  As discussed above, Donetta Bolden, Renee Williams, and Detective Clifton Johnson each testified concerning out-of-court statements that Manson Grant made to them identifying Petitioner as his assailant.  Petitioner asserts that admission of

this hearsay testimony violated his Sixth Amendment right to confront and cross-examine the witnesses against him.

Interpreted literally, the Sixth Amendment's Confrontation Clause would seem to preclude the admission of any statement made by a declarant who fails to testify at trial.  In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court addressed "the relationship between the Confrontation Clause and the hearsay rule with its many exceptions."  *Id.* at 62.  While the Court rejected a literal interpretation of the Confrontation Clause as "unintended and too extreme," the Court nonetheless recognized that the Confrontation Clause "was intended to exclude some hearsay."  *Id.* at 63.  The Court recognized that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," while also acknowledging that "competing interests, if closely examined, may warrant dispensing with confrontation at trial."  *Id.* at 63-64.  In an attempt to balance these competing interests, the Court articulated the following standard:

> [W]hen a hearsay declarant is not present for cross-examination, at trial, the Confrontation Clause normally requires a showing that he is unavailable.  Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66.

The Court reaffirmed this standard on subsequent occasions.  *See, e.g., Idaho v. Wright*, 497 U.S. 805 (1990); *Lilly v. Virginia*, 527 U.S. 116 (1999).  In 2004, however, the Court revisited this issue.  In *Crawford v. Washington*, 541 U.S. 36 (2004), the Court rejected the *Roberts* standard, concluding instead that testimonial statements of absent declarants are admissible under the Confrontation Clause only if the declarant is unavailable and the defendant had a prior opportunity to

cross-examine the declarant.  *Id.* at 42-69.  However, the *Crawford* decision was not issued until 2004, long after Petitioner's conviction became final.  The Supreme Court has since declared that its *Crawford* decision does not apply retroactively to convictions which were final prior to its issuance.  *See Whorton v. Bockting*, 127 S.Ct. 1173, 1181-84 (2007).  Thus, the standard applicable to Petitioner's Confrontation Clause claim is that articulated by the Supreme Court in *Ohio v. Roberts* and its pre-*Crawford* progeny.

Prior to trial the prosecutor moved for the admission of the statements at issue.  (Trial Transcript, April 14, 1998, 37).  The trial court permitted these statements to be admitted under the residual or catch-all hearsay exception articulated in the Michigan Rules of Evidence.  *Id.* at 37-47.  This particular exception to the rule against hearsay is not considered a "firmly rooted" exception.  *See, e.g., Wright*, 497 U.S. at 817-18.  Thus, the admission of the statements at issue satisfies the Confrontation Clause only if such statements bear "particularized guarantees of trustworthiness."

The Supreme Court has "decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the [Confrontation] Clause."  *Id.* at 822.  Instead, the Court has indicated that "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."  *Id.*  Moreover, the court must be confident that "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility."  *Lilly*, 527 U.S. at 136.

In an attempt to properly implement the *Roberts* standard, courts, including the Supreme Court, have identified various factors which are relevant to the determination of whether a hearsay statement bears sufficient indicia of reliability such that its admission does not violate the Confrontation Clause.  These factors include: (1) the voluntariness and spontaneity of the statements; (2) whether the

declarant consistently repeated the statements; (3) whether the statements were based on the declarant's first-hand knowledge; (4) whether the declarant uttered the statements in response to leading questions; (5) the declarant's mental state; and (6) whether the declarant possessed a motive to fabricate the statements at issue. *See Wright*, 497 U.S. at 821-22; *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir. 1995); *United States v. Barrett*, 8 F.3d 1296, 1300 (8th Cir. 1993); *United States v. Accetturo*, 966 F.2d 631, 635 (11th Cir. 1992); *Barker v. Morris*, 761 F.2d 1396, 1401 (9th Cir. 1985); *United States v. Colon-Miranda*, 992 F.Supp. 82, 85 (D. Puerto Rico 1997).  The Supreme Court has cautioned, however, that "[t]hese factors are, of course, not exclusive, and courts have considerable leeway in their consideration of appropriate factors."  *Wright*, 497 U.S. at 822.

    In reviewing Petitioner's Confrontation Clause claim, the Michigan Court of Appeals considered these factors and concluded that

> The [victim] was clearly unavailable because he was dead.  In addition, his statements to Johnson, Bolden and Williams had a particularized trustworthiness, given the context in which they were made.  There was no evidence whatsoever that the victim suffered from memory loss before the incident or that he was incoherent when he made the statements. There was no evidence that the victim was ever confused about what had happened to him or that he gave nonsensical information or answers to questions involving the incident.  Even after the victim was in the hospital for a few days and his cognitive functioning declined, he was still oriented to person and place and knew what happened to him.  The victim *consistently* maintained at all times that the "yard boy" committed the crime.  And, there was no evidence to indicate that the yard boy was anybody but defendant.  Additionally, the statements were *voluntarily* made and were *not the product of any pressure or undue influence* from the police or others.  More importantly, the statements were made based on the declarant's *personal knowledge*.  The victim had ample opportunity to observe his attacker and he personally knew his attacker.
>
> \*       \*       \*
>
> There was also *no* showing that the victim had a *motive to fabricate* the identity of his attacker or had any bias against defendant.  The statements

-24-

the victim made, which identified the attacker, were not self-serving. There is nothing in the record to suggest that the victim had an incentive to accuse defendant.   Defendant's argument in this regard is disingenuous.   The fact that several years earlier defendant took the victim's truck and did not bring it back in a timely fashion does not demonstrate a motive to fabricate, especially since the record supports that, after that time, defendant and the victim maintained a working relationship.  There was no evidence of trouble between the victim and defendant until shortly before the assault and robbery.  Moreover, the fact that defendant and the victim argued about twenty-five dollars does not explain or provide a motive for the victim to lie that defendant was his attacker.  Rather, the argument over the money was the impetus for the crime itself and this supports a conclusion that the identification was not fabricated.

\*       \*       \*

Finally, it does not appear that cross-examination would have had any utility had the victim been available.  The victim never wavered about the identification of his assailant.  In addition, there was no expectation that if he testified, his testimony would have varied from his prior identification.  Moreover, the evidence showed that the victim suffered a cognitive decline subsequent to being in the hospital for several days after the attack.  Trial was more than six months after the incident.  Any deficiencies suffered by the victim, which would have been shown on cross-examination, would not be relevant to the victim's ability to identify defendant near the time of the crime.

Under the circumstances, we find that there was sufficient indicia of reliability to admit the statements and that the trial court did not abuse its discretion when it admitted the victim's statements to Johnson, Bolden and Williams under MRE 803(24).

*People v. Lee*, No. 219538, Opinion at 8-9 (Mich. Ct. App., Nov. 3, 2000) (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.**          **Denial of Counsel During Pre-Custody Lineup Claim**  (Claim III)

As discussed above, Detective Johnson visited Manson Grant in the hospital on July 28, 1997.  During this visit, the detective showed Grant a "set" of photographs, from which Grant identified Petitioner as the man who attacked and robbed him.  Petitioner asserts that his constitutional rights were violated by the fact that he was not represented by counsel at this pre-custody photographic lineup.

The Michigan Court of Appeals concluded that Petitioner was not entitled to be represented by counsel at this pre-custody photographic lineup.  *People v. Lee*, No. 219538, Opinion at 9 (Mich. Ct. App., Nov. 3, 2000).  This conclusion is consistent with controlling Supreme Court authority.  *See United States v. Ash*, 413 U.S. 300, 313-21 (1973) ("the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender").

In light of this authority, the Court concludes that denial of this particular claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, denial of this claim was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.**          **Sentencing Claims**  (Habeas Claim VI)

Petitioner asserts that his sentence is invalid because the trial court failed to consider the appropriate "individualized" factors in crafting his sentence.  Petitioner further asserts that his sentence is invalid because it is violates the principle of proportionality.

A.      Individualized Factors Claim

Petitioner asserts that a criminal sentence is invalid unless the sentencing court considers the following factors: (1) the severity of the crime; (2) the nature of the crime; (3) the circumstances surrounding the criminal behavior; (4) defendant's attitude toward his criminal behavior; (5) defendant's criminal history; (6) defendant's social and personal history; and (7) statutory sentencing limits. Petitioner also asserts that the sentencing court must consider the purposes underlying the imposition of punishment: (1) discipline; (2) protection of society; (3) rehabilitation; and (4) deterrence. Petitioner claims that in imposing sentence the trial court failed to properly consider these various factors.

Petitioner has not identified (and the Court has not located) any authority which warrants habeas corpus relief for a state court's failure to consider the aforementioned factors. While the trial court's alleged failure to consider such factors may violate state law, Petitioner is not entitled to relief based on an alleged violation of state law. 28 U.S.C. § 2254(a). Petitioner must instead demonstrate that his sentence violates the Constitution, laws, or treaties of the United States. *Id.*

In this respect, it has long been recognized that when imposing sentence, "courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151 (1997); *see also*, *Roberts v. United States*, 445 U.S. 552, 556 (1980) (a "fundamental sentencing principle" is that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come"). As the *Watts* Court further observed, "[h]ighly relevant - if not essential - to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and circumstances." *Watts*, 519 U.S. at 151-52. Sentencing courts may even consider past criminal behavior

-27-

which did not result in a conviction, or for which the defendant was never tried.  *See Id.* at 152 (citations omitted); *Collins v. Buckhoe*, 493 F.2d 343, 345 (6th Cir. 1974) (citations omitted).

   Sentences imposed on the basis of "misinformation of constitutional magnitude," however, may present grounds for habeas corpus relief.  *Roberts*, 445 U.S. at 556 (citations omitted).  To prevail on a claim that he was sentenced on the basis of such misinformation, Petitioner must establish that "the disputed information was materially false and that the trial court relied on the information." *United States v. Andrews*, 240 F.Supp.2d 636, 638 (E.D. Mich. 2003) (quoting *Buckhoe*, 493 F.2d at 345-46).  Petitioner also has a due process right to not be sentenced based on constitutionally impermissible factors such as race, religion, gender, or political affiliation.  *See Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005) (quoting *Zant v. Stephens*, 462 U.S. 862, 885 (1983)); *United States v. Traxler*, 477 F.3d 1243, 1248 (10th Cir. 2007) (citing *Gardner v. Florida*, 430 U.S. 349, 358 (1977)).

   A review of the record reveals no evidence that the sentencing court violated these guidelines when crafting Petitioner's sentence.  The sentencing transcript instead reveals that (contrary to Petitioner's argument) the sentencing court carefully considered the various factors identified above and arrived at a sentence which the court felt was appropriate to the particular circumstances of this case.  The Michigan Court of Appeals found this particular claim to be without merit.  *People v. Lee*, No. 219538, Opinion at 12 (Mich. Ct. App., Nov. 3, 2000).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.       Proportionality Claim

Petitioner also asserts that his sentence violates the principle of proportionality.   The Sixth Circuit has observed that because the United States Constitution "contains no strict proportionality guarantee," a claim that the sentencing court violated Michigan's principles of proportionality is not cognizable on federal habeas review.  *Lunsford v. Hofbauer*, 1995 WL 236677 at \*2 (6th Cir., April 21, 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991)).   The Eighth Amendment "does not require strict proportionality between crime and sentence."  *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001).  Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed.  *Layne*, 324 F.3d at 473. In this case, Petitioner's sentence was in no way "grossly disproportionate" to the crime committed.  The Court recommends, therefore, that this claim presents no issue upon which habeas relief may be granted.

V.                    **Ineffective Assistance of Counsel Claims**  (Habeas Claims IV and V)

Petitioner has asserted numerous claims that he was denied the right to the effective assistance of trial and appellate counsel.   Most of these claims have been procedurally defaulted, however, and are analyzed in a separate section below.   The two ineffective assistance of counsel claims which have not been procedurally defaulted are addressed in this section.   Petitioner asserts that his trial counsel rendered ineffective assistance by: (1) failing to object to an improper jury instruction; and (2) failing to allocute at sentencing.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

-29-

Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, Petitioner must further establish that his attorney's performance was prejudicial in that it denied him a fair trial. *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

A.      Jury Instruction Claim

Petitioner asserts that his trial attorney rendered ineffective assistance by failing to request that the trial court provide the jury the following instruction:

CJI2d 7.8 - Identification

(1)     One of the issues in this case is the identification of the defendant as the person who committed the crime. The prosecutor must prove beyond a reasonable doubt that the crime was committed and that the defendant was the person who committed it.

(2)     In deciding how dependable an identification is, think about such things as how good a chance the witness had to see the offender at the time, how long the witness was watching, whether the witness had seen or known the offender before, how far away the witness was, whether

the area was well-lighted, and the witness's state of mind at that time.

(3)     Also, think about the circumstances at the time of the identification such as how much time had passed since the crime, how sure the witness was about the identification, and the witness's state of mind during the identification.

(4)     You may also consider any times the witness failed to identify the defendant, or made an identification or gave a description that did not agree with his identification of the defendant during trial.

(5)     You should examine the witness's identification testimony carefully.  You may consider whether other evidence supports the identification, because then it may be more reliable.   However, you may use the identification testimony alone to convict the defendant, as long as you believe the testimony and you find that it proves beyond a reasonable doubt that the defendant was the person who committed the crime.

Petitioner asserts that his attorney should have requested this particular instruction because it "define[d] or limit[ed] the use of the [identification] evidence" presented at trial.  Even if the Court assumes that counsel was deficient for failing to request this particular instruction, Petitioner cannot demonstrate that counsel's failure deprived him of a fair trial.

The trial court provided the jury with detailed instructions which incorporated the essence of the above instruction.  The jury was instructed that Petitioner was presumed innocent and that "this presumption continues throughout the trial and entitles the Defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty."  (Trial Transcript, April 21, 1998, 801).  The jury was instructed that it was their "job to decide what the facts of this case are" and that they "must decide which witnesses you believe and how important you think their testimony is."  *Id.* at 804.  The jury was further instructed that:

There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions:

One, was the witness able to see or hear clearly?  How long was the witness watching or listening?  Was anything else going on that might have distracted the witness?

Two, did the witness seem to have a good memory?

Three, how did the witness look and act while testifying?  Did the witness seem to be making an honest effort to tell the truth or did the witness seem to evade the questions or argue with the lawyers?

Four, does the witness's age and maturity affect how you judge his or her testimony?

Five, does the witness have any bias, prejudice or personal influence (sic) in how this case is decided?

Six, have there been any promises, threats, suggestions or other influences that affected how the witness testified?

In general, does the witness have any special reason to tell the truth or any special reason to lie?

All in all, how reasonable does the witness's testimony seem when you think about all the other evidence in the case?

*Id.* at 804-05.

With respect to this particular claim, the Michigan Court of Appeals concluded that:

Defendant makes no effort to show that "but for defense counsel's errors," there was a reasonable probability that the proceeding would have been different.  Moreover, the record does not support defendant's claim that a further instruction on the issue of identity would have, with reasonable probability, changed the outcome of the proceeding.  The instructions as given were adequate.  Defendant was not deprived of a defense and the jury was not only aware that identification was an issue but, it was informed that the prosecutor had to prove that defendant was the perpetrator beyond a reasonable doubt.  The jury clearly rejected defendant's claim that the victim's identification was not reliable.  Further, instruction on the issue of identification evidence would not have

-32-

changed the verdict.  Thus, defendant's claim of ineffective assistance
fails.

*People v. Lee*, No. 219538, Opinion at 11 (Mich. Ct. App., Nov. 3, 2000) (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    Failure to Allocute

Allocution has been defined as "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence."  *United States v. Chong*, 104 F.Supp.2d 1232, 1232-33 (D. Hawai'i 1999) (quoting Black's Law Dictionary (7th ed. 1999)).  With respect to allocution, Petitioner's counsel made the following comments at sentencing:

> By way of allocution, I have advised my client that in my opinion since
> this matter is definitely going up on appeal, that I respect the jury's
> verdict, as I do as an attorney, for a variety of reasons that SADO or an
> appellate lawyer should look at, I believe allocution would be
> inappropriate as this case will be appealed.

(Sentencing Transcript, May 18, 1998, 7).  Petitioner asserts that his trial counsel rendered ineffective assistance by "failing to allocute at sentencing."

Even if the Court assumes that counsel's conduct in this regard constitutes deficient representation, Petitioner cannot demonstrated that he was prejudiced thereby.  Petitioner has failed to

identify any information or argument that could reasonably have been expected to result in a lesser sentence. As the Michigan Court of Appeals observed:

> It is apparent from a review of the sentencing transcript that trial counsel was prepared for sentencing and successfully represented defendant on several issues, including restitution. Defendant fails to make any attempt to show that the outcome of the sentencing proceeding would have been different if counsel had allocuted on his behalf. Defendant does not proffer one mitigating factor or circumstance that his counsel should have brought to the trial court's attention, which would have changed the outcome of the sentence.

*People v. Lee*, No. 219538, Opinion at 11-12 (Mich. Ct. App., Nov. 3, 2000) (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VI.        **Procedurally Defaulted Claims** (Habeas Claims VII and VIII)

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state

procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). Furthermore, to find that a petitioner has procedurally defaulted a particular claim, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish the existence of cause and prejudice for his procedural default, or if a fundamental miscarriage of justice would result from the failure to grant the relief he seeks. *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991); *Coleman*, 501 U.S. at 750-51; *Buell*, 274 F.3d at 348.

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish that a miscarriage of justice would result from the Court's failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). The burden to make this showing rests with Petitioner, *see Floyd v. Alexander*, 148 F.3d 615, 618 (6th Cir. 1998); *Mitchell v. Rees*, 114 F.3d 571, 577 (6th Cir. 1997), who must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error probably resulted in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326. This requires Petitioner to overcome a hurdle higher than that to establish prejudice. *Id.*

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R. 6.508(D)(3). In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default. *See Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002); *Simpson*, 238 F.3d at 407. Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues as to which it is applied. *Simpson*, 238 F.3d at 407.

As noted above, claims VII and VIII asserted in Lee's petition for writ of habeas corpus were not properly exhausted when initially filed. This matter was stayed so as to provide Petitioner an opportunity to properly present these claims to the state courts. Petitioner subsequently returned to state court and presented these claims, which were denied by the Michigan Supreme Court on the ground that Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." Accordingly, while these two claims have now been properly exhausted, they are nonetheless procedurally defaulted. Petitioner may obtain relief on these claims, therefore, only if he can establish

the existence of cause and prejudice for his procedural default, or if a fundamental miscarriage of justice would result from the failure to grant the relief he seeks.

A.      Ineffective Assistance Claims  (Habeas Claim VII)

Petitioner has asserted several claims, all procedurally defaulted, that his trial and appellate counsel rendered ineffective assistance.  Because these claims are without merit, Petitioner cannot establish that he was prejudiced by his attorneys' alleged shortcomings.  Accordingly, these claims cannot form the basis for the relief which Petitioner seeks.

1.      Preliminary Examination Claim

Petitioner asserts that during his preliminary examination his attorney "failed to pay attention to the testimony of Officer Gary Cheatum" and as a result later misstated the officer's testimony when posing a question to the officer on cross-examination.  Petitioner asserts that this shortcoming relieved the prosecution of its burden of proof to establish that Manson Grant had been robbed.  Petitioner asserts that absent counsel's error the charges against him would have been dismissed for lack of evidence.

First, in finding that there existed sufficient evidence to bind Petitioner over for trial on the charge of armed robbery, the court expressly stated that it was relying on the *evidence* presented during the preliminary examination.   (Preliminary Examination Transcript, Sept. 11, 1997, 7).  Statements made by Petitioner's counsel in the course of questioning a witness do not constitute evidence.  Thus, there is no reasonable basis to conclude that the alleged misstatement by Petitioner's counsel contributed to the court's probable cause finding.  Furthermore, even in the absence of the

alleged misstatement by Petitioner's counsel, the prosecution presented more than sufficient evidence to support the decision to bind Petitioner over for trial on the charge of armed robbery.  (Dkt. #29-31).

2.    Failure to Call Witnesses, Impeach Witnesses, or Investigate Witnesses

Petitioner asserts that the following conduct by his trial counsel constitutes ineffective assistance: (1) failure to call Ray Hill as a witness; (2) failure to call witnesses that could testify regarding the victim's allegedly inconsistent statements; (3) failure to call as witnesses the medical personnel who treated Grant following his assault; (4) failure to impeach the credibility of Officers Cheatum and Johnson; and (5) failure to investigate Donetta Bolden.  Petitioner has failed to demonstrate that performance of these various tasks would have resulted in the production or presentation of any favorable evidence.  Thus, Petitioner cannot establish that the outcome of his trial would have been different had his attorney not failed to perform these particular tasks.

3.    Claims Asserted Against Petitioner's Appellate Counsel

Petitioner asserts that his appellate counsel rendered ineffective assistance by failing to request a *Ginther* hearing and pursuing the aforementioned claims that his trial counsel rendered ineffective assistance.  Because Petitioner has not demonstrated that his trial counsel rendered ineffective assistance, Petitioner's appellate counsel was not ineffective for failing to pursue these particular claims.

B.    Speedy Trial Claim  (Habeas Claim VIII)

Petitioner asserts that his Sixth Amendment right to a speedy trial was violated in this matter.  As previously noted, Petitioner has procedurally defaulted this claim.  Ineffective assistance of

counsel can "supply the cause that, together with prejudice, would excuse a procedural default." *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). However, because Petitioner did not suffer a violation of his right to a speedy trial, he cannot establish that his appellate counsel was ineffective for failing to pursue this issue. Thus, Petitioner cannot demonstrate that there exists cause to excuse his procedural default.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial." U.S. Const. amend. VI. This right applies to the states through the Fourteenth Amendment. *See Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005). When analyzing a claim that a criminal defendant was denied the right to a speedy trial, the court must consider the following factors: (1) length of the delay; (2) reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice. *Id.* (quoting *Barker v. Wingo*, 407 U.S. 514, 533 (1972)).

If the defendant fails to demonstrate that the delay was "uncommonly long," his claim fails and the analysis need proceed no further. *See Stegall*, 427 F.3d at 1025-26. If, on the other hand, the defendant satisfies this initial threshold, the remaining factors are "considered together with such other circumstances as may be relevant." *Stegall*, 427 F.3d at 1025. The length of the delay is measured "from the date of the indictment or the date of arrest, whichever is earlier." *Id.* at 1026.

Petitioner was arrested on July 29, 1997, and was subsequently arraigned on September 22, 1997. (Dkt. #28, 33). Trial in this matter began on April 14, 1998. (Dkt. #36). Thus, Petitioner experienced a delay of 259 days between the date of his arrest and the commencement of his trial. As discussed above, most of this delay was attributable to the prosecution appealing the decision by the trial court that there did not exist sufficient evidence to charge Petitioner with felony murder. The delay

experienced by Petitioner in this matter was not "uncommonly long" and, therefore, the Court need not analyze the remaining factors as Petitioner did not suffer a violation of his right to a speedy trial. *See United States v. Gardner*, 488 F.3d 700, 719 (6th Cir. 2007) (a 265 day delay was not "uncommonly long," especially in light of the fact that the case involved pre-trial motions, and, therefore, the defendant's Sixth Amendment right to a speedy trial was not violated).

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Lee's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: January 7, 2008

_/s/ Ellen S. Carmody_____
ELLEN S. CARMODY
United States Magistrate Judge